258 S.W.2d 283 (1953)
ROPER
v.
CLANTON et al.
No. 7147.
Springfield Court of Appeals. Missouri.
May 13, 1953.
Kirby W. Patterson, Springfield, for appellant.
*284 Haymes, Dickey & Dickey, Victor O. Coltrane, Springfield, for respondents.
McDOWELL, Judge.
This is an action in contract and to establish a mechanic's lien. The petition was filed March 17, 1952, in the Circuit Court of Greene County, Missouri, and was tried June 12, 1952, by the court, resulting in judgment for defendants. Plaintiff appealed.
Plaintiff's petition alleged that defendants were the owners of certain real estate (describing it) situated in Springfield, Missouri, improved by a frame apartment house at 649 West Tampa Street; that on or about November 7, 1951, defendants entered into an oral contract with plaintiff whereby plaintiff agreed to install new service and panels and re-circuiting apartments at said address and defendants agreed to pay for the same. Plaintiff further alleged that he performed the work and furnished certain materials, (describing it) and that the reasonable value of said labor and materials so furnished was $735.46. The petition alleged the filing of the account, together with a mechanic's lien, in the Circuit Court of Greene County, and prayed judgment for $735.46 and asked that it be declared a mechanic's lien against the real estate described in the petition.
Defendants' answer was a general denial.
At the conclusion of plaintiff's evidence the trial court sustained a motion for a directed verdict for defendant, Lucy Clanton, and, at the close of all of the evidence, the court rendered judgment for defendant, C. H. Clanton.
The evidence shows that defendants owned an apartment house at 649 West Tampa Street in Springfield; that it was an old house containing ten apartments of two rooms each. Defendant, C. H. Clanton, on November 7, 1951, telephoned plaintiff who was, at the time, engaged in the electrical contracting business and doing business as Roper Electric Company; that he was having trouble with the electrical equipment in said building.
The testimony shows that plaintiff and defendant, C. H. Clanton, went to said apartment building, in the nighttime, to determine the cause of the trouble and found that the circuit had been overloaded and a fuse had blown.
The evidence shows that on the night the alleged contract was made, there were three people presentplaintiff, defendant and defendant's brother. Plaintiff admits that, at no time, did he talk to Mrs. Clanton or have any dealings with her whatsoever.
There were two circuits constructed with No. 14 wire, one serving the upstairs and one serving the downstairs of the building. On one circuit there was a bath, stoker and nine apartments and on the other circuit, one apartment and one bath. These apartments, each, had a refrigerator attached so as to overload the circuit. Plaintiff testified about the matter in these words:
"* * * In other words, what had really happened, the circuit had become overloadedit had did that a number of times before. A fuse had blown. * * * So what we had to do was to go to every apartment in the building, be sure that the entire load was disconnected and warn the people not to turn anything on until we got back around to them. Mr. Clanton was expressing the fear all the time that it was going to be an awful cold night and it just must be done. And I went around, and he went with me, and we did, finally, by relieving the load, and put a fuse in, and then the stoker came on, the blower came on, and then one by one we put the rest of the building back in service. And by using a fuse which was twice too largethat shouldn't have ever been used on that size wire to begin withwe did hold the load until we were able to get there and straighten it out. Now, in going over the job that night, Mr. Clanton wondered why he couldn't have those long pencil-type fuses.
"* * * He understood, of course, thathe somewhere had learned, of course, that you could buy those in larger sizes than a 30-ampere. 30-ampere is the largest size of plug fuse that is made. So I told him yes, he could have that. He made some remark about what would that cost to do that? I said, `Well, Mr. Clanton,' I said, "I could give you an intelligent estimate as *285 to the cost of rebuilding your service, which would give you the pencil-type fuse, but,' I said, `when you get into anything further than that in the re-circuiting of your building, being an old house, it would be a pretty difficult thing but it could be done.' And that was all the conversation on that."
Plaintiff testified that while there they were called over to another building owned by defendants on Lyon and Lynn Streets; that they went over there and did some work on the lighting system; that when they got this job done on Lynn Street that night, out in the middle of the street, defendant, Clanton, took out his pocket book and offered to pay for the work. Plaintiff told defendant he would just bill him for all the work at one time and that, after that, each went his own way.
Plaintiff testified he never billed defendants, at any time, for this work because defendant had given him the job of repairing the apartment house. He also stated he gave defendants a discount of twenty-five per cent on materials furnished.
Plaintiff testified that the condition of the wiring of the apartment was old and inadequate and hazardous; that the No. 14 wire in use had only a rated capacity of 15-amperes; that No. 14 wire should never be used in excess of 15-ampere fuse and, at the time, a 30 fuse wouldn't hold it. He testified that the circuits were well overloaded and needed attention and defendant, Clanton, admitted he wanted the condition corrected.
On cross-examination plaintiff testified: "Mr. Clanton, while standing in the snow knee-deep that night, told me to just go on over there and fix that job up. And that is what I did, * * * I didn't go over there with the express purpose of doing anything except merely seeing that the job was finished. I didn't go into all the minute details you are trying to get into. * *"
Plaintiff gave this testimony: "Well, Judge, as I recall, during our going over the building and disconnecting these various rooms, he himself, brought up the subject that something should be done about his wiring. And he brought up this: why couldn't he have some of those pencil-type fuses? And I said, `Well, sir, you can and should have them.' He said, `What will that cost?' `Well, sir,' I says, `to give you an estimate as to the cost of that to the meter, the service, would be a very simple thing,' `but,' I said, `getting on into figuring the circuiting of the building would be rather difficult, however,' I said, `it could be done.' And that was all that was said about it until we went on over to the other building, and was ready to leave the other job, he says, `Just go ahead and fix that job up over on Tampa.'"
Plaintiff testified that the following day he had the area of the building figured as required by the code, to determine how many circuits the building required; that upon this basis, it was determined that the building needed two circuits for each apartment, one for the appliance circuit and one for the lighting circuit. In addition to that, it needed a circuit for lighting the halls and basement, plus a circuit for the stoker and blower, making a total need of 22 active circuits. He testified they installed on each of the two floors, a 12-circuit multi-breaker to take care of the 22 circuits.
We think the testimony shows that the work done by plaintiff, under this employment, complied with the code and that plaintiff actually did the work sued for and furnished the materials as alleged in the petition; that if plaintiff is entitled to recover, we think the evidence clearly establishes that the reasonable value of the services and materials furnished was the amount sued for in the petition.
The city ordinance of Springfield relating to the electrical wiring of houses was introduced. The evidence is undisputed that the City of Springfield adopted the National Electrical Code. The evidence, on the part of plaintiff, showed that when the wiring of an old building was in a condition such as the one in question, the owner of the house was required to bring the condition of the wiring up to comply with the National Electrical Code, which is also the city code. The city inspector testified that the work done by plaintiff was the very minimum required by the city code and that such work could not have been done at any substantially less expenditure of time and labor *286 and material than what was actually done by plaintiff. He testified that he permitted the use of romex on this job because there was no remodeling going on inside the house and that the cost was just about half the price a pipe job would be.
Plaintiff's testimony further shows that while this work was being completed, defendant, C. H. Clanton, was remodeling an office in the building adjoining the one where plaintiff was working and was there almost every day during the entire three weeks that plaintiff was doing the work. He saw the workmen at lunch and out in front of the house, and, yet, he says that he never paid any attention to the work until just the day before the job was completed when he tried to call plaintiff.
The evidence on the part of plaintiff shows that some three days after the work started he called defendant on the telephone and asked him about using romex on the building and that defendant told him to go ahead. Plaintiff's workmen did testify that defendant seemed to think there was more work being done than was necessary on this job.
Defendants' evidence admits that defendant, C. H. Clanton, called plaintiff on the 7th of November, 1951. This defendant stated that during the summer he and the tenants had put in electric refrigerators in the building and when cold weather came along and the stoker started, he began to have trouble with fuses blowing out on one circuit. He testified there were only two circuits in the building; that there were nine apartments and one bath and stoker on one circuit and one apartment on the upstairs circuit. He stated it was the circuit with the nine rooms, bath and stoker that was giving the trouble. He then gave this testimony:
"* * * I said to him, `Would it help to put in the tubular fuse at the meter?' And he said that would be all right but, pointing here to these two meterstwo circuits, he just done like this, he said, `Mr. Clanton, that is not your trouble; here is your trouble,' he says, `you have got too many of these on one circuit,' he said, `what we should do is to gather up a few of the wires off of this circuit and put them over on the other and even them up, and then, by all means, you should have an extra one for the stoker, so that if a rock blows the fuse then you wouldn't disturb your tenants.' * * *"
He testified plaintiff said it wouldn't be much of a job, that all he would do was gather the wires off of one and put them on the other and even them up. He stated there was never anything said about going inside one of the apartments or anything. He then stated:
"* * * Now if he had done what he said he would do, I could have done it myself, with the help of my brother, in a half-a-day, * * * All he needed to do: there was one bathroom and one apartment upstairs on this other circuitthe other four apartments upstairs could easilyall he would have had to have done was clip the wires and hook them on this other one. That's all he was supposed to do, that is all he was told to do, and it was his suggestion that that was all that needed done. * *"
The witness testified that plaintiff told him twice it wasn't much of a job and then he made this statement: "And I said, `Well, go ahead.' * * *" Then he gave this testimony:
"* * * I was going over there every day or so to see how the boys were getting along with our office, decorating and fixing it. One time, a few days after he said he could go ahead, I went over there and I had just twenty minutes to spare, had an appointment back at the office; when I went in these two boys that was on the stand here today was standing out at the curb talking to a passerby. I went in and stayed twenty minutes, and when I came out they were standing there yetI don't know whether it was the same person. They were standing there, and they broke up and went back and they had a little tool box sitting on the porch. * * *"
He testified the next time he went in was just before the job was finished and that he asked the boys what in the world was going on there and stated that he asked them to do a little repair job that he could have done in a half-day and they were tearing the *287 place up. He stated the workmen informed him that when they started wiring the house they had to follow the electrical code; that he tried to call Mr. Roper but the line was busy.
Defendant testified that when plaintiff called him and informed him that he had permission from the electrical inspector to use romex, he asked plaintiff why it was necessary to use either, that he was only just to pick up a few wires and attach them to another circuit. He stated that plaintiff said he had to use just a little, especially in the basement and that he was not going to run up a lot of material bills against him. He said this took place just before the completion of the job and that he thought the statement was reasonable and told him to go ahead. He testified that when the bill for $735 was presented he thought it was $700 too high.
We think this is the substantial testimony relating to the contract and the work done thereunder.
This cause having been tried before the court, it is the duty of the appellate court to review the case upon both the law and the evidence as in suits of an equitable nature and to reach our own conclusions as to the facts and the law, giving due deference to the findings of the trial court. Section 510.310 RSMo 1949, V.A.M.S.; Hastings v. Hudson, 359 Mo. 912, 224 S.W. 2d 945; Eiswirth Const. & Equipment Co. v. Glenn Falls Ins. Co., Mo.App., 240 S.W.2d 973; Faire v. Burke, Mo.Sup., 252 S.W.2d 289.
In this opinion we will refer to appellant as plaintiff and to respondents as defendants and when we use "defendant" we refer to defendant, C. H. Clanton.
At the close of plaintiff's case the trial court sustained a motion to dismiss as to defendant Lucy Clanton. Plaintiff's evidence wholly failed to make a case against this defendant. The testimony shows that the real property on which a mechanic's lien was sought to be established was held by the entirety and the evidence, in no way, showed any contract, either actual or constructive, between plaintiff and Lucy Clanton.
Under plaintiff's first assignment of error, as to the duty of the court, the law is properly stated. Under point (b) in this assignment of error, plaintiff states where one, at the request of another, performs work and labor in constructing or repairing, without an express agreement as to the amount of compensation, the law implies a promise on the part of the owner to make a reasonable compensation therefor. There can be no question but what this is a proper statement of the law. Plaintiff cites 17 C.J.S., Contracts, § 4 c., p. 321; American Displays v. E. T. Swiney Motors, Inc., Mo. App., 240 S.W.2d 732, 735; Martin v. Martinous, Mo.App., 219 S.W.2d 667; and Thomas v. Walnut Land & Coal Co., 43 Mo.App. 653.
The above cited cases are all actions in quantum meruit. The basis for recovery in quantum meruit is unjust enrichment and, therefore, without more authority than these cases, we would say the cases are not in point.
The sole question before the court, in this case is, did plaintiff make a case by proving the contract relied upon in the petition? It is the contention of the defendants that plaintiff pleaded one contract and proved another.
The trial court found for defendants. He made no findings of fact or conclusions of law and there was no request therefor. We take it that the trial court then found that plaintiff failed to make a case.
There is no dispute between the parties that there was a contract between the plaintiff and defendant, C. H. Clanton, made November 7, 1951, to repair the electrical equipment of defendants' apartment house but plaintiff claims the contract was to do the work for which he has sued and alleged in his petition and the defendants claim that the contract was to merely gather up a part of the wires on one circuit in said building and attach them to another circuit so as to even the load between the two circuits in said building, and, further, the defendants say they authorized the building of a circuit to the furnace and blower but that they specifically didn't authorize plaintiff to re-circuit the building and to install the equipment which he did.
*288 We agree with the law as stated by defendants in their points and authorities under assignment I. We have stated the duty of the court in the beginning of this opinion and the appellate court will not set aside a judgment unless the same is clearly erroneous, and will give due regard to the opportunity of the trial court to judge of the credibility of the witnesses as is provided in Section 510.310 RSMo 1949, V.A.M.S.
Point II, in defendants' brief, raises the sole question in this lawsuit, as follows: "In the instant case, plaintiff's petition alleged an express contract. The evidence in the case established a different contract, namely, that plaintiff would gather up a few wires from one circuit and put them on the other circuit, and put in another circuit for the stoker."
With this contention we cannot agree. The agreement between the parties arises from their intention implied or presumed from their acts where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract.
There can be no doubt in the minds of this court that there was a definite understanding between plaintiff and the defendant under the evidence in this case that plaintiff was to repair the electrical equipment in defendants' apartment building. There certainly was a meeting of the minds upon this point.
In 17 C.J.S., Contracts, § 4, p. 318, the following principle of law is announced:
"A contract implied in fact is one not expressed by the parties, but implied from facts and circumstances showing a mutual intention to contract. It does not arise contrary to law or the express declaration of the parties. * * *
"Neither a written offer and acceptance nor oral counterparts are essential to establish a contractual relationship, for unambiguous conduct of one party toward another under such circumstances as clearly to manifest an intention that one party perform and that the other party compensate for such performance is sufficient. A `contract implied in fact,' which term has been subjected to criticism, or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract. It has been said that such a contract must contain all the elements of an express contract, * * * it is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown. Such a contract does not arise out of an implied legal duty or obligation, but out of facts from which consent may be inferred.
"The implication, of course, must be a reasonable deduction from all the circumstances and relations of the parties, such as was within the contemplation of the parties when making the contract, or else necessary to carry their intention into effect, although it need not be evidenced by any precise words, and may result from random statements and uncertain language."
In Holmes v. Freeman, Mo.App., 150 S.W.2d 557, 562, the court makes the following statement of law:
"* * * The mutual assent of the parties necessary to the formation of the contract must be gathered from the conduct of the parties and the language employed by them, and the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. The law `judges of his intention by his outward expressions and excludes all questions in regard to his unexpressed intention. If his words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on the subject. * * *' 17 C.J.S., Contracts, § 32, pages 361, 362."
In Longmire v. Diagraph-Bradley Stencil Mach. Corp., Mo.App., 176 S.W.2d 635, 646, the court states the law:
*289 "* * * It has long been the law that the question of whether a contract is made or not depends, not on what one of the parties understood as to his actions or sayings, but upon what was actually said and done. Farley v. Pettis [Pettes], 5 Mo.App. 262. Though there must be a meeting of the minds of the parties to constitute a contract, such meeting of the minds is to be determined by the expressed, and not by the secret, intention of the parties. Seavy & Flarsheim Brokerage Co. v. Monarch Peanut Co., Mo.App., 241 S.W. 643, 644. * * * We stated the rule in the case of Holmes v. Freeman, Mo.App., 150 S.W. 2d 557, loc. cit. 562, as follows: `The law "judges of his intention by his outward expressions and excludes all questions in regard to his unexpressed intention. If his words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on the subject. * * *" 17 C.J.S., Contracts, § 32, pages 361, 362.'"
The same rule of law was expressed in McClintock v. Skelly Oil Co., 232 Mo.App. 1204, 114 S.W.2d 181, 189.
Following the rule of law as laid down in Holmes v. Freeman, supra, 150 S.W.2d loc. cit. 562, that is: "* * * The mutual assent of the parties necessary to the formation of the contract must be gathered from the conduct of the parties and the language employed by them, and the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. The law `judges of his intention by his outward expressions and excludes all questions in regard to his unexpressed intention. If his words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on the subject. * * *'", we find from the evidence in the case at bar, that the plaintiff and defendant, C. H. Clanton, entered into an implied contract in fact on November 7, 1951, whereby plaintiff agreed to install new service and panels and re-circuiting the apartment building in question and defendant agreed to pay therefor. This conclusion is reached from the reasonable meaning of the words used in conversation between the parties relative to the repairing of the electrical equipment in defendants' building and from the condition and circumstances shown to exist at the time. That is, that this was an old house; that the two circuits serving it were inadequate to carry the load which had been imposed by the adding of refrigerators in each of the ten apartments and the necessary burden created by the stoker and blower in the basement, which furnished the heating equipment for said building. And the fact that the city electrical code prescribed certain minimum requirements to be met in doing the work and that these requirements were shown by the evidence to have been met and no unnecessary work or cost incurred in the performance of the work by plaintiff. We think the judgment of the trial court in finding for defendant, C. H. Clanton, was in error and that his finding cannot be supported upon any reasonable theory.
All of the evidence shows that the installation of twenty-two circuits, by plaintiff, in the apartment building, in doing this repair job, was necessary to meet the minimum requirements of the city code.
Judging the intention of the parties by reasonable standards in regard to the matter in question, we find that there was a mutual assent of the parties necessary to the formation of the contract alleged in plaintiff's petition. We find that the plaintiff performed his part of this contract and that the law implied that the defendant pay the plaintiff the reasonable value of the labor performed and the materials furnished in completing the work; that the evidence shows that the amount sued for by plaintiff was the reasonable value of the labor performed and materials furnished and we hold that the judgment of the trial court should have been for plaintiff for the amount sued for.
Defendants' contentions that the contract was only to gather up a few wires from one circuit and place them on another circuit *290 and to add a circuit for the blower and stoker, we think, is not tenable from the evidence and from a reasonable interpretation of the intention of the parties gathered from their conversations and outward expressions and from the nature of the work to be done. Under the law it is immaterial what might have been the real but unexpressed state of the mind of defendant on the subject but it is what was the reasonable meaning of the expressed contract made between them and the reasonable interpretation of its terms.
We agree with defendants' contention under point V that the trial court did not err in sustaining a motion to dismiss as to Lucy Clanton at the close of plaintiff's case.
Under the evidence that the property in question was held by the entirety, the trial court properly dismissed plaintiff's claim for a mechanic's lien.
It is the judgment and order of the court that this case be reversed with directions that the judgment of the trial court be affirmed as to defendant, Lucy Clanton, and as to the denial of the mechanic's lien; that the judgment be reversed as to the finding for defendant, C. H. Clanton, against plaintiff on the amount sued for under the contract and the clerk is directed to enter a judgment for plaintiff against C. H. Clanton for the sum of $735.46, with interest at the rate of six per cent from November 27, 1951.
VANDEVENTER, P. J., and BLAIR, J., concur.