**KOSHER ZION SAUSAGE COMPANY OF CHICAGO, a Corporation, Plaintiff-Appellant,**

v.

**ROODMAN'S, INC., Defendant-Respondent.**

**No. 33245.**

St. Louis Court of Appeals.

Missouri.

June 13, 1969.

F. Douglas O'Leary, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for plaintiff-appellant.

Hyman G. Stein, Charles Alan Seigel, St. Louis, for defendant-respondent.

CLEMENS, Commissioner.

Plaintiff (Kosher Zion) appeals from a $2,872 judgment on defendant's (Roodman) counterclaim, challenging the sufficiency of Roodman's evidence to establish an implied contract and also the propriety of Roodman's verdict-directing instructions. We affirm, finding the evidence sufficient and the instructions invulnerable to the attack made.

After twenty years of doing business together Kosher Zion, a Chicago manufac-

turer of kosher meat products, sued Roodman, a St. Louis distributor, for its $5,882 account. Roodman admitted the account but went to trial on its two-count counterclaim. Roodman got a verdict on Count I for a $1,136 credit for spoiled products and on Count II got a verdict for a $1,736 credit for a five percent commission on Kosher Zion's direct sales to a St. Louis retailer.

On the issue of submissibility we state the verdict-consistent evidence.

Although there was no witness to relate the original terms between the parties, it is clear that in 1945 Kosher Zion and Roodman began an informal business relationship that lasted amicably until 1963 and thereafter with some dissension until 1965. At the start Roodman added Kosher Zion meat products to the line of food products it sold to St. Louis retailers. There were frequent communications between the parties by personal conferences and telephone calls. Every week Roodman phoned its order to Kosher Zion to fill orders Roodman had taken and also to keep a stock of Kosher Zion products on hand to fill "spot" orders placed by Roodman's customers. Kosher Zion paid Roodman a five percent commission on sales. Roodman sold no other brand of kosher meats and was Kosher Zion's only distributor in St. Louis. Kosher Zion and Roodman worked closely in sales promotion and advertising programs, and Roodman continuously added new customers and increased the sales volume of Kosher Zion products. This activity finally amounted to more than a hundred customers and sales of over $30,000 a month.

One disputed part of the parties' dealings concerned the credit allowances Kosher Zion gave Roodman for refunds Roodman had given its retailers for spoiled products. From time to time Roodman's retailers would return tainted products and apply in writing for credit. Roodman would give the retailer credit and destroy the product. Roodman would hold these memoranda, often over a year, and send them to Kosher Zion, who would then give Roodman credit for the total. This method was followed agreeably from 1945 to 1963. In the 1963–65 period Roodman gave its customers credit for $1,360 spoilage. Kosher Zion inquired about these items but Roodman delayed sending them, partly because of moving to a temporary office. Kosher Zion never allowed Roodman this claimed credit. This is the basis of Roodman's Count I.

The other disputed part of the case concerned credits to Roodman for Kosher Zion's direct sales to one St. Louis retailer, Louie's Delicatessen. In 1955 one of Roodman's long-time employees, Louis Fiddleman, quit and went into business for himself as Louie's Delicatessen. He wanted to buy kosher meats directly from Kosher Zion. Roodman objected, insisting it was Kosher Zion's exclusive distributor in St. Louis. To resolve the dispute Kosher Zion and Roodman began an arrangement whereby Kosher Zion sold directly to Louie's Delicatessen but paid Roodman a five percent commission on those sales. Until mid-1963 Kosher Zion paid this commission to Roodman, but thereafter it paid none on the $34,720 in direct sales to Louie's Delicatessen. This was the basis of Roodman's Count II.

Dissension began in 1960, when a St. Louis rabbinical organization declared that Kosher Zion's products were not strictly kosher. To counteract this Roodman added another brand of meat products that did meet the local religious standards. When Kosher Zion objected, Roodman offered to give up this other brand if Kosher Zion could get its products approved by the local rabbinical organization, but this was never done. Sales of the new brand began to cut into the volume of Roodman's sales of Kosher Zion's products, but they kept on doing business the same way. As sales finally fell to less than half of maximum volume, the parties had a series of meetings about the problem. In November of 1963 Kosher Zion began sending its own

salesmen into St. Louis, soliciting directly from Roodman's customers. Roodman protested, without avail. Meanwhile, Roodman continued to promote and sell Kosher Zion products but in reduced volume, and Kosher Zion continued to pay Roodman the five percent commission on Roodman's sales. But after November, 1963, Kosher Zion neither paid nor credited Roodman for spoilage refunds or for direct sales Kosher Zion continued to make to Louie's Delicatessen. During 1963–65 nothing definite was said or done about terminating the parties' relationship, and Kosher Zion told Roodman it still wanted Roodman as its St. Louis distributor. Then on November 3, 1965, Kosher Zion wrote Roodman it was no longer its St. Louis distributor. At that time Kosher Zion's account against Roodman was $5,882. Kosher Zion promptly filed suit, and Roodman counterclaimed for the unpaid spoilage allowance and the five percent direct sales commission.

■ Roodman bases its counterclaim on the premise of an agreement by Kosher Zion to pay Roodman for spoiled merchandise and for direct sales to Louie's Delicatessen. Without evidence of a specific agreement between the parties (express contract), Roodman may recover on evidence from which such an agreement may be inferred (implied contract). These terms do not denote different kinds of contracts but refer to the evidence by which the agreement is shown. If shown by the direct words of the parties, spoken or written, the contract is express. But if the agreement can only be inferred from the acts and conduct of the parties, interpreted in light of the subject matter and of the surrounding circumstances, then the contract is implied. (Bailey v. Interstate Airmotive, Inc., 358 Mo. 1121, 219 S.W.2d 333[5, 6]; Farris v. Faris' Estate, Mo. App., 212 S.W.2d 71[1, 2]; Corbin on Contracts, § 18.)

■ Thus, a contractual relationship may arise without written or oral offer and acceptance, and does arise where the circumstances and the acts and conduct of the parties support a reasonable inference of a mutual understanding and agreement that one party perform and that the other party compensate for such performance. (Bailey, supra, at 219 S.W.2d 333[4]; Shepard v. Glick, Mo.App., 404 S.W.2d 441[2].) As said in Roper v. Clanton, Mo.App., 258 S.W.2d 283[5]: "The agreement between the parties arises from their intention implied or presumed from their acts where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract."

This principle of implied contract is tersely illustrated in Prospect News Printing Co. v. Swindle, Mo.App., 15 S.W.2d 922[1], where a newspaper subscriber stopped paying when his subscription expired but for thirteen years continued to get the paper each week from his post office box. In ruling for the publisher in its suit for unpaid subscriptions, the court held that a contractual obligation arose by necessary implication from the defendant's course of conduct in accepting the newspapers. This principle applies to our case.

Original spokesmen for the parties did not testify, but we do know that for twenty years Kosher Zion paid Roodman a five percent commission on sales. Suppose that in 1965 Kosher Zion shipped merchandise to Roodman and then refused to pay the commission. There would be no doubt of Kosher Zion's liability to Roodman since Kosher Zion's agreement to pay the commission would readily be inferred from its course of conduct. Aside from this inferred agreement to pay the five percent commission, Roodman is contending for two other parts of the agreement—the spoilage allowance and the direct sales commission.

■ For eighteen years Kosher Zion had paid the spoilage allowance upon Roodman's request, sometimes encouraging Roodman to report its losses more prompt-

ly. Similarly, for over eight years Kosher Zion had paid Roodman a five percent commission on Kosher Zion's direct sales to Louie's Delicatessen. From this long course of dealing and the overall circumstances of the parties' business relationship, the jury could and did infer a common understanding that Kosher Zion had obligated itself to pay both the spoilage allowance and the direct sales commission.

Kosher Zion contends these inferred obligations were conditioned on Roodman's selling only Kosher Zion products and that the obligations ceased in 1960, when Roodman began selling the competitive brand of meat products. But the parties continued thereafter to do business on the same terms with no evidence of modification. From the evidence it appears the parties' relationship remained constant until Kosher Zion's termination letter of November, 1965, after Roodman's claims arose.

Based on evidence that warrants a jury's finding of an implied contract, we deny Kosher Zion's challenge to the sufficiency of the evidence to support Roodman's Counts I and II, and pass on to Kosher Zion's attack on Roodman's verdict-directing instructions.

■ Kosher Zion contends it was error for Roodman to submit its counterclaim on the theory of implied contract because Roodman had pleaded an express contract. We accept, arguendo, the questionable distinction in legal effect between express and implied contracts (see Bailey, supra, at 219 S.W.2d 333[6]). Roodman's counterclaim pleaded only that Kosher Zion "promised and agreed" to pay a spoilage allowance and "agreed and contracted" to pay the direct sales commission. The counterclaim did not plead written or spoken words by which the parties reached these agreements, and therefore cannot be said to have pleaded an express rather than an implied contract. (Roper, supra, at 258 S.W.2d 283[5, 6].)

The issue pleaded and tried here was whether Kosher Zion and Roodman had made an agreement for payment of the spoilage allowance and the direct sales commission, and whether that agreement was in effect for the 1963-65 period, when Roodman's claims arose. By its answer to Roodman's counterclaim Kosher Zion admitted that Roodman had been its St. Louis distributor but alleged that Roodman was not its distributor when Roodman's claims arose. That was the issue tried.

The verdict directors:

"Your verdict must be for the Defendant on Count I of Defendant's Counterclaim if you believe:

"First, there was an implied contract between Defendant and Plaintiff that Plaintiff would give to Defendant a credit allowance for the products of Plaintiff that were returned to Defendant by its customers on account of spoilage of products.

"Second, the Defendant had products returned to it by its customers on account of spoilage for which Plaintiff has never given to Defendant a credit allowance."

\*    \*    \*    \*    \*    \*

"The verdict must be for the Defendant on Count II of Defendant's Counterclaim if you believe:

"First, there was an implied contract between Defendant and Plaintiff that Defendant was entitled to a five percent (5%) commission on all sales made directly by Plaintiff to Louie's Delicatessen, Inc.

"Second, the Plaintiff made sales directly to Louie's Delicatessen, Inc., for which said sales Defendant has not been paid its said five percent (5%) commissions from Plaintiff."

Additionally, the court defined "implied contract":

"The term 'implied contract' as used in these instructions means that a contract will be implied, even though there is no express written or express oral contract, where there are circumstances which according to the ordinary course of dealing of the parties establishes a common understanding."

Kosher Zion specifically contends Roodman's verdict directors failed to hypothesize the elements of mutuality and consideration. Kosher Zion cites no case condemning an instruction for such omissions. It cites Shafer v. Southwestern Bell Telephone Co., Mo., 295 S.W.2d 109[16, 17], for the general proposition that a verdict director must submit every essential, disputed element; on the same point it cites Marr v. Marr, Mo.App., 319 S.W.2d 920[5–8]. The Marr case, however, upheld a verdict director on an implied contract that submitted only "(1) plaintiffs delivered the rock to defendant, (2) if defendant accepted and received same and (3) if defendant was benefited thereby, then the law implied a promise to pay and the verdict should be for plaintiffs."

We find, contrary to Kosher Zion's contention, that the instructions did submit the elements of mutuality and consideration. Reading the verdict directors and the definition instruction together, the jury was required to find there was a "common understanding" between Kosher Zion and Roodman as to the spoilage allowance and the direct sales commission. "Common understanding" is tantamount to "mutuality". (Black's Law Dictionary, Fourth Edition, p. 1696, "Understanding"; 90 C.J.S. p. 1029.) And Kosher Zion having agreed to pay Roodman the contested items (as the jury was required to find it did), then either Roodman's promise to be Kosher Zion's distributor or its act in doing so (an uncontested issue) constituted consideration for Kosher Zion's promise to pay. (Mohawk Real Estate Sales, Inc. v.

Crecelius, Mo.App., 424 S.W.2d 86[4–6], citing Restatement of Contracts, § 75.) We deny Kosher Zion's challenges to Roodman's verdict-directing instructions.

We do not want this ruling to be taken as blanket approval of Roodman's verdict directors. Under Civil Rule 70.-01(e), V.A.M.R., and Price v. Seidler, Mo., 408 S.W.2d 815[17], a verdict director should submit only the ultimate *factual* issues. Here, each verdict director required the jury to find an "implied contract", a *legal* issue. This vice was mellowed by the definition instruction, which does submit the need for an agreement between Kosher Zion and Roodman. Kosher Zion does not criticize that instruction, so in keeping with the principle of reading instructions together we have read the verdict directors in light of the definition instruction. But we do not approve the use of a definition instruction in cases like this one where the ultimate issue is the existence of an agreement. Instructions should be written in "words and phrases that do not require further definition where that is possible." (Black v. Kansas City Southern Railway Co., Mo., 436 S.W.2d 19[13–15]; and see MAI, "How to Use This Book", p. xxxii.) To comply with Civil Rule 70.01(e), V.A.M.R., Roodman's verdict directors should have omitted the element of "implied contract" and included instead a submission of the ultimate fact of the parties' agreement, thus making a definition instruction unnecessary.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, judgment is affirmed.

WOLFE, P. J., and DOUGLAS W. GREENE, Special Judge, concur.