**CENTRAL MISSOURI FOODS, INC.,**
**Plaintiff-Appellant,**

v.

**GENERAL GROCER COMPANY,**
**Defendant-Respondent.**

**No. 36416.**

Missouri Court of Appeals,
St. Louis District,
Division Two.

June 8, 1976.

Leonard R. Yocum, St. Louis, for plaintiff-appellant.

George Thomas, St. Louis, for defendant-respondent.

KELLY, Judge.

This is an appeal from the judgment rendered in behalf of the respondent, General Grocer Company, after a trial to the court without a jury. We affirm.

Appellant, the plaintiff in the trial court, brought this suit "On Account" seeking to recover $975.39 and interest for some chickens delivered to Dixon's Discount Center of Columbia, Missouri, between April 13, 1971, and May 19, 1971, which it had billed to the respondent in accordance with an alleged agreement between it and respondent's "district manager," Mr. Staicoff. Respondent, in its Answer, denied the agreement and also pleaded the Statute of Frauds. § 432.010 RSMo. 1969. No request for findings of fact or conclusions of law were made by the parties, and at the conclusion of the non-jury trial the trial court entered judgment for respondent, the defendant in the trial court.

█ In reviewing a court-tried case it is the duty of the appellate court to review the case upon both the law and the evidence as in suits of an equitable nature. Due regard shall be given to the opportunity of the trial court to have judged the credibility of the witnesses. Rule 73.01(a), (b). However, as this court stated in *Bader Automo-*

*tive & Indus. Supply Co. v. Green,* 533 S.W.2d 695, 698 (1976), the deletion of the phrase " 'the judgment shall not be set aside unless clearly erroneous' " from the former Rule, effective January 1, 1975, did not convert appellate courts into "judicial second guessers," and where the decision depends upon the credibility of the witnesses and the weight of the evidence, an appellate court should generally defer to the findings of the trial court unless it is satisfied they should have been decided otherwise.

Appellant corporation is a processor and wholesaler of chickens. Respondent corporation operates a distribution and retail consultation service with about 105 independent retail stores, including Dixon's, as clients. As a part of this consultation service respondent authorizes the billing of purchases made through its merchandising department by its clients from vendors, pays the bills, and charges its clients a fee for these services. On occasion, if the client's credit is good, the client may order directly from the vendor without going through respondent's merchandising department and if the bill is sent to the respondent it will pay the bill for the client and then charge the client for the amount of the bill plus the service charge.

Mr. Fred Beaman, sales manager for appellant, testified that on March 26, 1971, Dixon's Discount Center ordered, for the first time, some chickens by telephone. Because this was a new account, Mr. Beaman delivered the chickens personally and before unloading them he spoke to Mr. Susich, an employee of Dixon's Discount Center, and told him that he was from appellant, that he had the chickens, and asked how they wanted to pay for them. At that time Mr. Susich was sitting in the back of the Dixon's Discount Center with another man who was introduced to him as Mr. Staicoff. Mr. Staicoff, he testified, gave him his business card. This business card had Mr. Staicoff's name on it, "General Grocers" and stated that he was a supervisor "of some kind." After Mr. Staicoff identified himself and stated he was with General Grocers, he gave Mr. Beaman the address of General Grocers and told Mr. Beaman to bill the chickens through General Grocers in St. Louis. Mr. Staicoff did not tell him that he would have to obtain approval from General Grocers for any subsequent deliveries to Dixon's Discount Center. Prior to this occasion Mr. Beaman had never done business with respondent. Nevertheless, he was familiar with this type of business dealings because this same billing arrangement was utilized by other food distributors.

Further orders of chickens were placed by Dixon's Discount Center on April 1st and 3rd and appellant billed these to respondent for the three shipments on April 6, 1971. Respondent paid for these deliveries on April 9, 1971, by check. Further deliveries on April 5, 7 and 9, totalling $330.37 were also billed to respondent on April 14, 1971, and paid on April 16, 1971, by respondent. Nine other deliveries were made to Dixon's Discount Center by appellant between April 13 and May 3, 1971, and totalled $975.39. These, like the prior orders, were billed to respondent, but this billing was never paid and is the subject of this litigation. Mr. Beaman testified that he had no further correspondence with respondent after it paid for the deliveries other than receipt of payment for them. He denied that he had received any indication that Dixon's Discount Center would pay for the deliveries of the chickens despite the fact that the invoices sent to respondent were made out to Dixon's Discount Center.

Respondent's evidence was in conflict with that of appellant. Mr. Staicoff denied that Mr. Beaman inquired concerning the billing for the chickens at the meeting of March 26, 1971, although he admitted that he, during some discussion concerning the services afforded by respondent, did suggest that Mr. Beaman get in touch with Mr. Dietrich of respondent's meat department, because Mr. Dietrich was the merchandiser for that department. He made this suggestion because Mr. Susich explained to him what appellant's program was and "the head meatcutter" explained that they had a fine program, because you could buy pieces

of chicken, or chicken halves, or whole fryers. He thought the program sounded like a good one and thought that perhaps there were other stores in the area which could utilize this program of appellant. He testified that he did not tell Mr. Beaman to bill the chickens to respondent. He further testified that he had no authority to contract for his employer; his duties were to assist the member stores in merchandising, advertising, controls, office and register procedures.

Mrs. Gladys Humphrey, a billing-clerk typist employed by the respondent at the time of these transactions, described the manner in which respondent's meat merchandising department functioned as set out hereinabove. On April 8, 1971, after respondent had paid three billings for Dixon's Discount Center which had been submitted by appellant, she, at the direction of Mr. George Dietrich, respondent's meat merchandiser, prepared a master copy of a form letter which was then xeroxed and mailed to all of the vendors with which respondent did business. One of the vendors to whom this letter was mailed on April 8, 1971, was appellant. (Mr. Beaman testified that he did not receive this letter prior to May 19, 1971). The original or master copy of this letter was retained for a time and then discarded. Dixon's Discount Center's name was not specifically mentioned in the letter, because it was their practice not to name the client whose credit was not in good standing in this form letter. This letter is as follows:

"Gentleman:

We would like to restate our meat merchandising program in regard to collections pertaining to meats sold to General Grocer Company Cooperative Group members.

General Grocer Company assumes payment for all orders that originate from the headquarters meat department. Only by this method can we control our accounts and purchases.

If there are any questions regarding our program, please contact the writer. This is brought to your attention so that our credit losses can be held to a minimum.

/s/ George Dietrich"

Mrs. Humphrey testified that the reason the first three bills submitted to respondent were paid was that up until that time appellant's credit with respondent was in good standing.

On re-direct examination, Mrs. Humphrey testified that in addition to this letter of April 8, 1971, there was another notice sent to the vendors with the particular store's name and customer number on it notifying the vendors that the store named in the notice was no longer being serviced by respondent. However, she admitted that she had no personal knowledge of any such letter in this case and she had nothing to do with sending that letter. Although a copy of that letter was also kept in the company's files, she did not know where it was. Around the 1st of April, 1971, she recalled that a letter from Mr. Dietrich came around to the effect that Dixon's Discount Center was a bad credit risk.

George Dietrich also testified as a witness on behalf of the respondent. He had been employed by respondent for 19 to 20 years and at the time of his testimony was vice-president in charge of meat merchandising and produce for respondent. He too explained respondent's operation and stated that the only bills respondent guarantees are those where the orders come through the respondent's offices, but admitted that so long as the retailer was in good credit standing with the respondent it would pay also for bills submitted where the retailer or client dealt directly with the vendor. He denied that anyone had ever called him with respect to the conversation between Mr. Beaman and Mr. Staicoff of March 26, 1971, and that the payments made on the billings submitted to respondent by appellant were in any way connected with any conversation of that date. He explained payment of the first bills submitted by appellant on the ground that they were paid as a matter of course of operations inasmuch as Dixon's Discount Center was in good standing with respondent at that time.

He does not approve nor sign the checks in payment of the bills which come in. They are signed by the company controller or treasurer. He only hears when the bills are not paid. It is to respondent's advantage that this type of transaction occurs because they receive a fee for these services. He was familiar with the letter of April 8, 1971, sent to the vendors, because it was one of the form letters they send out periodically when they know of markets that are possibly fluctuating financially to remind the packers of what respondent's program is. They go out every three to four months because packers have a reluctance to ignore them, for the reason that the packers would rather go into a store and sell merchandise directly because the packers think they can get bigger orders that way than being channeled through the headquarters of the respondent. He was unable to establish the time when he learned that Dixon's Discount Center was in an unhealthy financial condition and whether it could have been prior to or subsequent to May 3, 1971. He did not personally send any notice through the mail but he had been told by the treasurer of the company that a "drop letter," i. e., a letter which terminates the buying privileges of the recipient, had been sent. It is not the same as the letter of April 8, 1971, which was an "advice letter" to packers to let them know what respondent's program was and if they had any question about the program they should get in touch with respondent.

On appeal, appellant presents three alleged trial court errors it argues entitle it to have the judgment set aside and a new trial granted. These are that the trial court erred in its finding and judgment for the respondent in that (1) such finding is against the weight of the credible evidence; (2) the agreement reached between appellant and respondent was an agreement between principals and not an agreement to answer for the debt of another; and (3) the trial court erred in admitting into evidence respondent's Exhibit A, and testimony concerning same because the Exhibit—a "copy" of a letter dated April 1, 1971—was

incompetent because it was not the best evidence, and, even if it were competent, there was no credible evidence that the letter was received by appellant prior to May 3, 1971, the date of the last shipment of chickens to Dixon's Discount Center.

We conclude that the trial court here was faced with the task of resolving conflicting evidence adduced during the course of the trial of this case which it decided adversely to appellant. The issues apparent in the evidence were whether there was any agreement between the parties whereby appellant was authorized to expect payment from the respondent; whether Mr. Staicoff had the authority, real or apparent, to enter into such an agreement with the appellant for the respondent; and whether the letter of April 8, 1971, reached appellant in time for it to be advised that it was not to extend further credit to the Dixon's Discount Center with an expectation that respondent would pay the bills. The trial judge was present at the time this evidence was adduced and was afforded the opportunity to observe the demeanor of the witnesses as they testified before him. Unless we conclude that he should have decided otherwise, we should defer to his judgment and affirm. Rule 73.01(a), (b). We should not "second guess" him. See: *Murphy v. Carron,* 536 S.W.2d 30 (Mo.).

The evidence is uncontradicted that on March 26, 1971, Dixon's Discount Center was a member of respondent's "Cooperative Group" entitled to purchase meat products under respondent's meat merchandising program and at that time, at least, still enjoyed a good credit standing with the respondent. It is also uncontradicted that prior to March 26, 1971, respondent had conducted no business with appellant. If Mr. Staicoff did not invite Mr. Beaman to bill the delivery of that date to respondent, the only other explanation for appellant having done so would have to rest on an inference that it resulted from Mr. Staicoff's testimony that he explained to Mr. Beaman the services afforded respondent's clients and that this included the privilege of billing for purchases through the respon-

dent and payment by respondent. Otherwise, there is no evidence appellant would have known of this service.

Nevertheless, there is no direct evidence offered by appellant that Mr. Staicoff had the power to authorize appellant to look to respondent for payment nor that in doing so, if he did, he was acting within the scope of his employment. Nor is there any evidence that Mr. Staicoff had done so on other occasions so that implied authority through a course of conduct might be found. Mr. Staicoff testified that he did not possess this power; appellant adduced no evidence, other than Mr. Beaman's testimony, that he did.

However, when appellant billed respondent for the deliveries of March 26, 1971, April 1 and 3, 1971, they were all paid for by respondent on April 6, 1971. Deliveries of April 5, 7 and 9, 1971, were likewise billed to respondent and paid for by it on April 16, 1971, some 8 days subsequent to the mailing of the letter of April 8, 1971, to all vendors doing business with respondent restating respondent's meat merchandising program. This apparent inconsistency is unexplained in the evidence. Nevertheless, all sales made to Dixon's Discount Center commencing with those of April 13, 1971, after respondent's could have expected that in the ordinary course of the mail appellant would have received its letter of April 8, 1971, were unpaid.[1]

■ There is no evidence of a written agreement between the parties. Assuming that the trial court concluded, as it might have in view of the conflicting evidence, that there was no oral agreement entered into by way of Mr. Staicoff's conversation with Mr. Beaman, even in the absence of an express contract the question still remains whether there was evidence of an implied contract which might have been inferred by the course of conduct of respondent in paying the bills for the deliveries prior to April 13, 1971. While we conclude that the trial court might have so found, *Kosher Zion Sausage Co. of Chicago v. Roodman's Inc.,*

442 S.W.2d 543, 546[2] (Mo.App.1969), we cannot hold that it was compelled to so find. We are not favored with its mental processes for the simple reason that neither party saw fit to request findings of fact. We discern that it might have concluded that these payments were made because when the bills came in, Dixon's Discount Center was still a member of the Group, and admittedly respondent had, in the past, made payments for members even though purchases did not originate from the respondent's headquarter's meat department.

■ Assuming the existence of an implied contract between the parties whereby respondent was to pay for goods delivered to Dixon's Discount Center, the question whether the agreement ran afoul of the Statute of Frauds, § 432.010 RSMo. 1969, is an affirmative defense and on this issue the burden of proof rests on the respondent. However, because of the failure of the parties to request findings of fact and conclusions of law we cannot glean whether this was the basis for the trial court's judgment in this case. For that reason we do not consider this point or rule on it because we believe there are other valid reasons the trial court reached the judgment it did, and this hinges on the admissibility of the letter of April 8, 1971, directed to the vendors, including appellant.

■ The general rule is that the best evidence of the contents of a writing is the writing itself. *Padgett v. Brezner,* 359 S.W.2d 416, 422[4] (Mo.App.1962). Here, the writing in issue is a xeroxed copy of a master copy. Mr. Beaman admitted receiving a copy of this letter although there was a conflict in his testimony as to when he did receive it. At trial he admitted that he did not know when it was received, although he did recall that he received a copy of the letter of April 8, 1971, from appellant's attorney on July 13, 1971. He also testified in his deposition that he had received a copy of the letter sometime around May 3, 4 or 5, 1971. The evidence is that the copy of the letter received into evidence is in fact a

---

1. April 8, 1971, fell on a Thursday.

duplicate of the original master letter, and as such it differs from a copy in being valid as an original. *Adler v. Ewing,* 347 S.W.2d 396, 402[11] (Mo.App.1961); *Schroer v. Schroer,* 248 S.W.2d 617, 622[8] (Mo.1952). We hold that the trial court did not err in receiving into evidence the duplicate copy of the letter of April 8, 1971.

██ With this document in evidence, we believe that even had the trial court found a contract, either express or implied, existed between the parties, from the evidence it could have found that this letter of April 8, 1971, put appellant on notice that respondent would be responsible for payment of orders by Dixon's Discount Center only if the orders originated from the headquarters of respondent and that any credit extended after receipt of the letter by appellant in the ordinary course of the mail would be unauthorized. When appellant received this letter is a question of fact. However, since the letter was mailed on Thursday, April 8, 1971, according to respondent's uncontradicted evidence, the trial court could have concluded that it was received prior to April 13, 1971, either on Saturday, April 10, 1971, or Monday, April 12, 1971. That, therefore, those sales made to Dixon's Discount Center between April 13, 1971, and May 3, 1971, were not authorized because not made through the headquarters of respondent. A finding of these facts support the trial court's judgment and we so hold.

Judgment affirmed.

CLEMENS, P. J., and STEWART, J., concur.