**ZELLMER REAL ESTATE, INC., Respondent,**

v.

**C. Wilson BROOKS and Martha H. Brooks, Appellants.**

**No. KCD 28964.**

Missouri Court of Appeals, Kansas City District.

Dec. 5, 1977.

Edward J. Murphy, Butler, for appellants.

Warren S. Earhart, Grandview, for respondent; Gersh, Holt, Earhart, Jones & Dibler, Grandview, of counsel.

Before PRITCHARD, P. J., SWOFFORD, C. J., and DIXON, J.

PRITCHARD, Presiding Judge.

Respondent obtained judgment, $29,250, upon the verdict of a jury, against appellants for a real estate commission upon an oral listing for sale of 1170 acres of land based upon its pleaded claim that it found ready, willing and able purchasers (W. A. and Clissie May Warner) in cash or on whatever terms were desired by appellants.

The dispositive issue is whether the "terms of the sale" should have been hypothesized in respondent's verdict directing instruction as an ultimate (and undisputed) fact to be found by the jury. Verdict directing Instruction No. 2 is:

"Your verdict must be for plaintiff if you believe:

First, plaintiff was a corporation and a licensed real estate broker, and

Second, plaintiff and defendants agreed that if plaintiff produced a purchaser who was ready, able and willing to purchase upon the terms specified by the defendants, plaintiff should receive as commission all that the purchaser agreed to pay for defendants' 1170 acre farm over $325.00 per acre, and

Third, plaintiff did produce a purchaser who was ready, able and willing to purchase on such terms and so informed defendants."

The evidence, including that of appellants' terms of sale, according to respondent, is this: On August 11, 1972, Martha called respondent Art Zellmer and asked him to list their farm for sale. Art and Barney Zellmer went to appellants' farm that day, and Wilson Brooks then agreed to take $300 net to him per acre. According to notes taken by Art at that time, the total price of the land was to be $380,250, "Terms according to tax man. Not over 29% down. 8% Int." Later that month, respondent produced a proposed 4 year lease contract with the Buerge Cattle Co., with an option to purchase, but Wilson rejected it. At this later time, Wilson raised the price of the land to $325 net to him per acre. On August 14, 1973, Art showed the farm to Bill Warner, Wilson inviting them into the home, where Martha was also present, and "They showed us through the house." Wilson then took Warner and Art in his truck and drove them over the farm, and on coming back to the house they had a discussion that the price to Warner was $350 per acre, payable $50,000 in escrow on closing (Wilson wanted 29% down, not to exceed $100,000), and the balance would be carried on a 20 year note at 8%, secured by a first deed of trust on the place. Wilson and Warner "shook hands on the front porch" as having made a deal. Wilson declined Art's offer to prepare a contract, saying that he would have his attorney draw one up within a week or ten days.

On August 22, 1973, Art called Wilson and Warner to come to respondent's office

again to discuss the sale and try to get a contract written. Art took notes (Plaintiff's Exhibit 10) of the then agreement, giving each a copy: "29% down. Not to exceed 100,000.00. Approx—50,000.00 note down in escrow, bal. of 29% down at closing date—1-3-74. 20 yr. pay—amortized—hay at actual cost of baling, raking, mowing, etc., seller to leave feeders, troughs, etc. No land to be sold off for at least 5 yr. prepayment clause upon mutual agreement. Buyer to be allowed to pay up to 100,000 as down payment after 1 or 2 yr. if tax man wont let that much down at closing."

Plaintiff's Exhibit 12, brought by Wilson at the same time, August 22, 1973, is this: "$50,000.00 in escrow note guaranteed by bank. $100,000.00 total due as down payment on Jan. 3, 1974. 409500.00 Total price 100,000.00 down pay 309,500.00 balance divided over 14 yr period. Any default in payment all becomes due or reverts to me without expense  principal payment will be $22,107.15 per year plus 8% interest on unpaid balance  No prepayment privilege  No land can be sold off for a 10 yr period  financial statement to bank and then a letter from bank stating he can or cannot handle payments." Art never showed Exhibit 12 to Warner "because some of the figures were different than he had agreed to on it."

Wilson, not having had his lawyer prepare a contract by September 1, 1973, Art prepared one of his own, had the Warners sign it and took it to the Brooks to try to get their signatures on it. This proposed contract (Plaintiff's Exhibit 14), a detailed printed form "(Approved by legal counsel for the Missouri Real Estate Association)" with blanks filled in, provides in essence: "The price for said property shall be Four Hundred nine thousand, five hundred and no/100 DOLLARS; to be paid by the Buyer as follows: $50,000.00 (note and cash) at the time of the execution and delivery of this contract, * * * and which is deposited with Butler State Bank as earnest money and as part of the purchase price * * * the Buyer shall pay the balance of the purchase price by delivering to the Seller $50,000.00 in cash or certified check, and if the Seller agrees to finance a part of the purchase price as hereinafter set forth, then by delivering the note and deed of trust as hereinafter provided, * * *." The "Financing Agreement" provides that the balance of the purchase price, $309,500.00, be financed by seller in equal installments over 20 years with 8% per annum interest, secured by a first deed of trust on the property. Special agreements on the reverse of Exhibit 14 are: "Seller to leave all cattle feeders now on place for buyer. Buyer to get possession of crop land as crops are harvested this fall and South large fescue pasture this fall also. Buyer to get hay at price to be agreed to between parties, price to be actual cost of mowing, raking, baling and storing on parts thats stored." Lined through with a pen and initialed "A.R.Z." is the sentence: "Buyer to have privilege of paying additional $25,000.00 or up to $25,-000.00 per year if he desires." Appellants refused to sign Exhibit 14.

Warner's version of the formation of an agreement was that on August 14, 1973, Art Zellmer quoted him a price of $350 an acre to purchase appellants' property, and he then went to the farm and had a discussion with appellants, that the "price, conditions, possession date, contract, what-have-you" were discussed, and the down payment was to be "$50,000.00 or satisfactory to $50,000.00 escrow until closing", the balance to be paid over 20 years in equal installments, and secured by a first deed of trust on the property. He testified, "Q (By Mr. Earhart) What was said, if anything, by the Brooks indicating they agreed to the deal? A  Well, we were paying each and every dollar he was asking. I agreed to the price; we made the deal and shook hands and I thought it was the best faith. I told him I would take the place at that figure." Mr. Brooks declined to have Zellmer prepare a contract, and said he would insist on having his lawyer do it and he would get it done in a week or a few days. At the August 22, 1973, conference, Warner stated that it seemed unreasonable to him to put up $50,-000.00 in escrow until the first of the year, and he asked Mr. Brooks if he would accept

$20,000.00 cash in escrow and "satisfy him with the balance of $30,000.00 until the contract was fulfilled at the end of the year." According to Warner, Mr. Brooks replied that he thought it could be worked out and could be if the bank "would O.K. it or say [Warner's] business was in such order they would do it or satisfy him in that manner." Mr. Brooks' version of this matter was that after about August 15, 1973, when he told Art Zellmer that the net price to him had risen to $350 per acre, Zellmer brought Warner back to the property at which time Warner "still wanted to give me a note and he wanted to be able to pay off the note any time and also some years he wanted to pay just interest, some years he wanted to pay more, and he wanted all my salt, feeders and my creep feeders and wanted my troughs and wanted me to leave all those free gratis." Mr. Brooks' response to these various propositions was "no".

On or about October 3, 1973, appellants' counsel prepared a contract which they signed and submitted to the Warners. The Warners rejected it because it set the selling price at $409,500.00, and required them to pay the real estate commission.

As shown by respondent's evidence, there are no discrepancies as to the price of the land, $350 per acre with $325 per acre net to appellants. The price, properly hypothesized in Instruction No. 2, is not the only term of sale. Although many customary matters may be left to future embodiment into a written agreement besides price, such as closing date; abstracts of title and examination; type of title standards; type of deed; tax payment and proration; insurance and assignment, the basic terms of purchase if in issue, as here, should be set forth in the verdict directing instruction, and the evidence, of course, should support the submission of those basic terms as ultimate facts. [Here, no question of submissibility of respondent's case may be considered because appellants did not preserve that issue for review by motion for directed verdict made at the close of the whole case. See *Millar v. Berg*, 316 S.W.2d 499, 502[1] (Mo.1958); *Pasley v. Newton*, 455 S.W.2d 43, 46[2] (Mo.App.1970).]

As noted, respondent's own evidence contained different versions as to the terms of sale allegedly agreed upon by the parties: First, "Terms according to tax man. Not over 29% down. 8% Int."; secondly, with Warner present, the price was $350 per acre, payable $50,000.00 in escrow [*presumably cash* ?] on closing; thirdly, "29% down. Not to exceed 100,000 approx. 50,000.00 *note* down in escrow, bal. of 29% down at closing date—1–3–74. 20 yr. pay—amortized—hay at actual cost of baling, raking, mowing, etc., seller to leave feeders, troughs, etc. No land to be sold off for at least 5 yr. prepayment clause upon mutual agreement. Buyer to be allowed to pay up to 100,000 as down payment after 1 or 2 yr. if tax man wo*nt* let that much down at closing." Wilson's version (Exhibit 12) was, "$50,000.00 in escrow *note guaranteed by bank*." [Wilson's evidence was that the bank officials were not asked to guarantee Warner's note, and that they would not have done so.] "* * * No prepayment privilege No land can be sold off for a 10 yr. period financial statement to bank and then a letter from bank stating he can or cannot handle". (Italics and brackets added.)

Then further, respondent's proffered written contract, signed by the Warners (Exhibit 14), contained further terms: "$50,000.00 *note and cash* * * * Buyer to get possession of crop land as crops are harvested this fall and South large fescue pasture this fall also", with a line through and initialed "A.R.Z." as to prepayment privileges. Warner's testimony was that the down payment was to be $50,000.00 or satisfactory to $50,000.00 escrow until closing. Then, at the August 22, 1973, meeting, there was discussion about as to only $20,-000.00 cash in escrow, and a satisfaction as to balance of $30,000.00 until the contract was fulfilled. According to Mr. Wilson, there was further discussion about giving a note and prepayment privileges, and waiver of principal payments.

MAI 29.01, paragraph second, provides "(here insert purchase price if in issue *plus*

*any other terms of purchase which are in issue* )." (Further italics added.) Notes on Use, paragraph 3 provides, "Insert if purchase price or other terms are in issue." The Committee's Comment is "Caution. Real estate contracts vary in content and lawyers must be sure to submit to the jury any additional issues which their special cases may contain." As to notes on use and committee comments, it was said in *Royal Indemnity Co. v. Schneider*, 485 S.W.2d 452, 458[4] (Mo.App.1972), "From the strict adherence to M.A.I. so often and forcefully reiterated by the Supreme Court, has developed the equally forcible admonition that 'Notes on Use' thereof be religiously followed." See also *Vest v. City Nat. Bank & Trust Co.*, 470 S.W.2d 518, 520[1] (Mo.1971); and *Gormly v. Johnson*, 451 S.W.2d 45, 47[2] (Mo.1970).

The matter of how the escrow deposit was to be made was an essential term of the contract—it would bear upon appellants' right to liquidated damages in case of buyers' default. The matter of prepayment of the balance after closing was also important—it would affect appellants' tax liability. Other disputed terms of sale could be likewise essential to an agreement. Under the submission, and especially in view of the imprecise evidence of these essential terms, the jury would be left to speculate and conjecture as to just what the parties agreed. Instruction No. 2 should have hypothesized whatever *ultimate* facts, for the jury to find, as to what the terms of sale were, in accordance with respondent's theory. In *Kosher Zion Sausage Co. of Chicago v. Roodman's, Inc.*, 442 S.W.2d 543, 548[7–9] (Mo.App.1969), it was said, " * * * Roodman's verdict directors should have omitted the element of 'implied contract' and *included instead a submission of the ultimate fact of the parties' agreement*, thus making a definition instruction unnecessary." (Italics added.) This does not mean, however, that a submission of the ultimate facts of the terms of the sale should be a rambling, argumentative pre-MAI type of instruction. Cf. *Barnes v. Marshall*, 467 S.W.2d 70, 79 (Mo.1971). Additionally, to the prejudice to appellants because Instruction No. 2 left the terms of sale to the jury's speculation and conjecture is that of depriving them of an opportunity to present a "true" converse instruction under MAI 33.01, or by using the third method of converse by hypothesizing ultimate facts relative to terms of sale which their evidence supported.

By their Point II, appellants contend that the court erred in failing to submit separate verdict directing instructions as to each appellant, thus requiring a finding of liability or non-liability as to both. This is expanded, for the first time, in the reply brief to a contention that Instruction No. 2 was erroneous by failing to require a finding of agency of Mr. Brooks for his wife. The point therefore will not be considered, but on retrial, if the evidence is similarly developed, the matter of submission of the issue of agency, and the appropriate forms of verdict should be considered. See 3 Am. Jur.2d Agency, § 359, pp. 718, 719; 3 C.J.S. Agency § 548, pp. 480, 483–484. Compare *Bowdern v. Rowland*, 21 S.W.2d 899 (Mo. App.1929), *Galemore Motor Co., Inc. v. State Farm Mut. A. Ins. Co.*, 513 S.W.2d 161, 168[11] (Mo.App.1974). The parties being apprised by their briefing, other contended errors will not likely recur upon retrial, and need not be ruled.

Because of error in giving Instruction No. 2, the judgment is reversed and the case is remanded for new trial.

All concur.